# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MIRNA HERNANDEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 16-10797-FDS |
| CITY OF BOSTON; Commissioner of ) | |
| Public Works JOANNE MASSARO; ) | |
| Superintendent of Bridges and ) | |
| Buildings FOUAD HAMZEH; BEC ) | |
| ELECTRICAL, INC.; CORA OPERATIONS, ) | |
| LLC; CORA OPERATIONS, INC.; ) | |
| ADVANCED ALARM SYSTEMS; ) | |
| HARDESTY & HANOVER, LLP; ) | |
| HARDESTY & HANOVER, LLC; ) | |
| HARDESTY & HANOVER HOLDING, LLC; ) | |
| B&B ELECTROMATIC, INC; B&B ) | |
| ELECTROMATIC CORPORATION; B&B ) | |
| ROADWAY, LLC; and B&B ARMR, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

SAYLOR, J.

This suit arises from the tragic death of Aura Beatriz Garcia. On December 31, 2013, Garcia was walking across the Andrew McArdle Bridge, a drawbridge in East Boston, Massachusetts, when it opened and closed, crushing her and causing her death.

Mirna Hernandez, Garcia's sister and the personal representative of her estate, has brought suit against multiple defendants. The complaint includes claims under 42 U.S.C. § 1983 against the City of Boston; Joanne Massaro, the Commissioner of Public Works; and Fouad Hamzeh, the Superintendent of Bridges and Buildings. The City, Massaro, and Hamzeh have

each moved to dismiss the section 1983 claims for failure to state a claim upon which relief can be granted. For the reasons stated below, those motions will be granted.

## I.     Background

The facts are set forth below as alleged in the first amended complaint.

### A.     Factual Background

#### 1.     The Parties

The McArdle Bridge is a two-lane drawbridge in East Boston, Massachusetts, that carries Meridian Street across the Chelsea River. The bridge is owned, operated, and managed by the City of Boston. (*Id.* ¶ 3, 37).

Joanne Massaro was, at all relevant times, employed by the City of Boston as the Commissioner of Public Works. (*Id.* ¶ 6). In that capacity, she established policies on behalf of the city's Public Works Department and was responsible for the training and supervision of all department employees. (*Id.*). She was also responsible for the operation and maintenance of all bridges in the city. (*Id.* ¶ 7).

Fouad Hamzeh was, at all relevant times, employed by the City of Boston as the Superintendent of Bridges and Buildings. In that capacity, he implemented city policies concerning bridges and buildings, trained and supervised employees, and was responsible for the operation and maintenance of the city's bridges. (*Id.* ¶¶ 8-9).

BEC Electrical, Inc., is Massachusetts corporation responsible for developing the opening and closing procedures of the McArdle Bridge as well as training city employees regarding those procedures. (*Id.* ¶¶ 10-11). Cora Operations, LLC, and Cora Operations, Inc., are Massachusetts corporations responsible for inspecting, servicing, and repairing the bridge. (*Id.* ¶¶ 12-13).

2

Advanced Alarm Systems, a Massachusetts corporation, Hardesty & Hanover, LLP, a New York partnership, and Hardesty & Hanover LLC, a New York corporation, are responsible for installing and maintaining video cameras and surveillance equipment on the bridge. (*Id.* ¶¶ 16-23). B&B Electromatic, Inc. and B&B Electromatic Corporation, Louisiana corporations, B&B Roadway LLC, an Alabama corporation, and B&B ARMR, a Texas corporation, are responsible for installing and maintaining other equipment on the bridge. (*Id.* ¶¶ 24-27).

### 2. The Events of December 31, 2013

The McArdle Bridge is raised and lowered by a bridge tender, who sits in a booth close to the bridge. (*Id.* ¶¶ 37-38). The City's bridge policy requires that the bridge tender ensure that the bridge is cleared of any obstructions, including pedestrians or cars, before opening the bridge. (*Id.* ¶ 39). According to the complaint, that policy was supposed to be posted inside the bridge tender's booth. (*Id.* ¶ 40).

On December 31, 2013, at approximately 12:25 p.m., Garcia walked across the bridge. (*Id.* ¶ 43). The spotlights on the bridge were not working. (*Id.* ¶ 42). The bridge tender opened the bridge while Garcia was walking across it, without first ensuring that the bride was clear of pedestrians. (*Id.* ¶ 44). As the bridge opened, Garcia clung to one of the bridge plates and screamed for help. (*Id.* ¶ 45). The bridge tender then closed the bridge on top of her, crushing her and causing her death. (*Id.*).

### B. Procedural Background

Mirna Hernandez is Garcia's sister and the representative of her estate. The amended complaint, filed on July 29, 2016, asserts a claim for wrongful death against the City of Boston (Count One); claims for gross negligence and wrongful death against BEC Electrical Inc. (Count Two), Cora Operations, LLC and Cora Operations, Inc. (Count Three), Advanced Alarm

3

Systems (Count Four), Hardesty & Hanover, LLP, Hardesty & Hanover, LLC, and Hardesty & Hanover Holding, LLC (Counts Five, Six, and Seven, respectively), B&B Electromatic, Inc., B&B Electromatic Corporation, B&B Roadway, LLC, and B&B ARMR (Counts Eight, Nine, Ten, and Eleven, respectively); and claims for deprivation of Fourteenth Amendment due-process rights, pursuant to 42 U.S.C. § 1983, against the City of Boston (Count Twelve), Joanne Massaro (Count Thirteen), Fouad Hamzeh (Count Fourteen), BEC Electrical, Inc. (Count Fifteen), Cora Operations, LLC, and Cora Operations, Inc. (Count Sixteen), Advanced Alarm Systems (Count Seventeen), Hardesty & Hanover, LLP, Hardesty & Hanover, LLC, and Hardesty & Hanover Holding, LLC (Counts Eighteen, Nineteen, and Twenty, respectively), and B&B Electromatic Inc., B&B Electromatic Corporation, B&B Roadway, LLC, and B&B ARMR (Counts Twenty-One, Twenty-Two, Twenty-Three, and Twenty-Four, respectively).

On November 18, 2016, the City of Boston, Hamzeh, and Massaro each moved to dismiss the Section 1983 claims against them for the failure to state a claim upon which relief can be granted. For the reasons stated below, those motions will be granted.

## II. Legal Standard

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

### III.   Analysis

Counts Twelve, Thirteen, and Fourteen assert claims under 42 U.S.C. § 1983 for deprivation of Fourteenth Amendment substantive due-process rights against defendants the City of Boston, Massaro, and Hamzeh, respectively. Section 1983 "creates a private right of action for redressing abridgements or deprivations of federal constitutional rights." *McIntosh v. Antonino*, 71 F.3d 29, 33 (1st Cir. 1995). "A claim under § 1983 has two 'essential elements': the defendant must have acted under color of state law, and his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law." *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008). The second element requires the plaintiff to show that the defendants caused the alleged deprivation. *Id.*

It is undisputed that the three defendants were acting under color of state law. The constitutional right alleged to be at issue is the Fourteenth Amendment right to substantive due process.

> The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving a person of 'life, liberty, or property, without due process of law.' U.S. Const. amend. XIV, § 1. This guarantee has both substantive and procedural components. The substantive due process guarantee functions to protect individuals from particularly offensive actions on the part of government officials, even when the government employs facially neutral procedures in carrying out those actions.

5

*Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006).

The scope of substantive due-process protections are quite narrow. *See Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008) ("Substantive due process is a constitutional cause of action that leaves the door 'slightly ajar for federal relief in truly horrendous situations.'") (quoting *Nestor Colon-Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45 (1st Cir. 1992)). It is not "a means of constitutionalizing tort law so as to 'impos[e] liability whenever someone cloaked with state authority causes harm.'" *Pagan*, 448 F.3d at 32 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998)) (alteration original). In order to state a valid substantive due-process claim, the complaint must allege that the plaintiff "suffered the deprivation of an established life, liberty, or property interest, *and* that such deprivation occurred through governmental action that shocks the conscience." *Clark*, 514 F.3d at 112 (emphasis original).

Harmful conduct generally reaches the level of "conscience-shocking" only when it is intentional. *See County of Sacramento*, 523 U.S. at 849 ("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). Negligently inflicted harm is "categorically beneath the threshold of constitutional due process." *Id.* Conduct that falls somewhere in between intentional and negligent—conduct that is reckless or grossly negligent—"is a matter for closer calls." *Id.* In at least some circumstances, conduct that is deliberately indifferent to the constitutional rights of others can be sufficient. *Id.* at 850.

Here, the complaint alleges a constitutional violation caused by defendants' alleged deliberate indifference to a known risk of harm. Because the standards of liability for municipalities and city officials are somewhat different, the claims against the City of Boston

6

and its employees, defendants Hamzeh and Massaro, will be addressed separately.

### A. Claim against the City of Boston

Municipalities cannot be held vicariously liable under §1983 for the torts of their employees or agents. *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. Thus, to state a claim against the City, plaintiff must plausibly allege that execution of its policy or custom caused Garcia's death in a way that shocks the conscience.

Read in the light most favorable to plaintiff, the complaint appears to allege that it was the City's policy or custom to not train its employees adequately on matters of bridge safety and that, as a result, the bridge tender raised the bridge without properly checking to see if it anyone was on it. The complaint specifically alleges that the City was deliberately indifferent by (1) "failing to ensure that all Bridge tenders were properly trained and educated [as to] the Bridge policies"; (2) "disregarding the Bridge policies in how to properly open the Bridge"; (3) "opening the Bridge without first observing to see if there were any pedestrians on the Bridge"; and (4) "inadequately ensuring that all Bridge tenders under their supervision complied with all requirements of the policies of the Bridge, specifically observing the Bridge prior to opening." (Am Compl. ¶ 164). The complaint does not allege that either the City of any of its employees—including the bridge tender—acted intentionally in causing Garcia's death.

The allegations of the complaint are insufficient to state a claim as to the City of Boston for a violation of substantive due-process rights. The Court's analysis is guided by the Supreme Court's analysis in *Collins v. City of Harker Heights*, 503 U.S. 115 (1992) and the First Circuit's

analysis in *Ramos-Pinero v. Puerto Rico*, 453 F.3d 48 (1st Cir. 2006).

In *Collins*, the widow of city sanitation worker who died of asphyxia after entering a manhole sued the city, alleging that it violated his due process rights by "following a custom and policy of not training its employees about the dangers of working in sewer lines and manholes, not providing safety equipment at job sites, and not providing safety warnings." 503 U.S. at 117. The Court held that, in the context of executive action, the substantive component of the Due Process Clause is violated only when that executive action "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." The court concluded that the city's alleged failings were analogous to typical state-law torts and were therefore not "conscience-shocking." *Id.* at 128. The court stated:

> Our refusal to characterize the city's alleged omission in this case as arbitrary in a constitutional sense rests on the presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces. Decisions concerning the allocation of resources to individual programs, such as sewer maintenance, and to particular aspects of those programs, such as the training and compensation of employees, involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic character of Government for the entire country.

*Id.* at 128-29 (internal citation omitted).

Similarly, in *Ramos-Pinero*, the First Circuit considered a substantive due-process claim brought on behalf of a fourteen-year-old boy who was killed when he fell into an open manhole. 453 F.3d at 53. The plaintiff alleged that various government officials failed to ensure the safety of the sewer system despite knowing of the risks posed by the open manhole, or, in other words, that they were deliberately indifferent to that known risk of harm. *Id.* The First Circuit concluded that the claims asserted were "analogous to a typical state tort claim" and thus were "insufficient to state a substantive due process violation." *Id.* at 54. The court followed the

8

Supreme Court's analysis in *Collins* and rested its conclusion on the presumption of rational decision-making in the administration of government programs. *Id.* It noted that even unwise or unreasonable decisions regarding the allocation of time and resources do not rise to the level of a constitutional violation, because the Constitution does not impose a duty of due care on the part of state officials (at least as to persons who are not in state custody). *Id.* The court also noted that the danger at issue was a danger to the general public, and not a danger that was specific to the young boy who tragically fell into the manhole, and that the "conscience-shocking" standard generally requires a known risk of harm to a specific victim or member of a limited and definable group. *Id.*

The same reasoning applies here. The complaint alleges that the City failed to maintain adequate bridge-safety policies and failed to train bridge employees properly.[1] However, there is a presumption that the allocation of time and resources to the development of a bridge-safety policy and the training of bridge employees was a rational decision, balancing many competing demands for scarce municipal resources. *See id.* (noting that conscious decision to not take certain safety precautions "may be unwise or unreasonable, but it does not 'shock the conscience' as that term is defined under the law"). In other words, there is a presumption that the decision was not arbitrary in a constitutional sense, and therefore not "conscience shocking," because it presumed that the city and its employees considered the particular risk as part of a rational decision-making process that took into account other known dangers and other demands on scarce resources. The complaint does not allege any facts to overcome that presumption.

---

[1] It is significant that the complaint does not allege that the City had no bridge-safety policy whatsoever. Rather, the complaint alleges that the City had a bridge policy, created by defendant BEC, that was intended to ensure that the bridge was clear of obstructions prior to opening and that was required to be posted in the bridge tender's booth. (Am. Compl. ¶ 39). Thus, the crux of the complaint's allegations appear to be that the policy is inadequate—for reasons that are not articulated—and that the City and its employees failed to train the bridge tender adequately as to that policy.

Furthermore, the danger to which the city and its employees were allegedly deliberately indifferent is a risk to all persons walking (or driving, or bicycling) across all drawbridges in the City of Boston—not a limited and specifically definable group. *See id.*

Finally, to the extent that the complaint asserts liability under the state-created-danger theory, it fares no better. The state-created-danger theory operates as an exception to the general rule that the Due Process Clause does not create an affirmative duty to protect a citizen who is not in state custody. It imposes constitutional liability "when the state acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of the state intervention." *See Schieber v. City of Philadelphia*, 320 F.3d 409, 416 (3d Cir. 2003).

The First Circuit has "never squarely accepted such a theory," *Morgan v. Town of Lexington*, 823 F.3d 737, 739 (1st Cir. 2016), but even assuming that it applies, it is inapposite here. The state-created-danger theory creates a duty for state actors to protect citizens from harm ultimately caused by other sources when the state actor takes an affirmative action that makes that harm more likely. Here, there is no allegation that the City exposed Garcia to a risk of harm from a third party. Rather, the complaint alleges that her death was caused by the bridge tender's failure to check the bridge for pedestrians before opening, which, according to the complaint, was itself caused by the City's failure to develop an adequate bridge safety policy and failure to train its employees adequately (including the bridge tender himself). Thus, the complaint alleges that the City was directly responsible for Garcia's death, not that it made her more vulnerable to injury from another source.

### B. Claims against Hamzeh and Massaro

The complaint further alleges that defendants Hamzeh and Massaro are liable for

Garcia's death insofar as they improperly hired and trained their subordinates and implemented inadequate bridge-safety policies. It alleges that Hamzeh and Massaro can therefore be held liable for the bridge tender's act of raising the bridge without first checking for pedestrians.

Supervisory officials may be held liable under § 1983 for the conduct of their subordinate only if (1) the behavior of the subordinate "results in a constitutional violation," and (2) the supervisors' actions or inactions were "affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." *Estate of Bennet v. Wainwright*, 548 F.3d 155, 176-77 (1st Cir. 2008) (internal quotation marks omitted) (alterations original).

As to the first prong, the complaint alleges that the bridge tender acted with deliberate indifference in opening the bridge without first checking for pedestrians. Under the circumstances, deliberate indifference may be enough to state a claim for a substantive due-process violation. *See County of Sacramento*, 523 U.S. at 849-50. As to the second prong, the complaint alleges generally that Hamzeh and Massaro were deliberately indifferent in their hiring, supervising, training, and policy implementation. However, there is no allegation that the bridge tender was unfit for his job. Furthermore, while the complaint alleges that Hamzeh and Massaro improperly trained and supervised their subordinates, there is no allegation as to the level of training or supervision that the bridge tender received. Finally, while the complaint alleges generally that Hamzeh and Massaro were deliberately indifferent in implementing and authorizing inadequate safety policies, the only actual policy alleged in the complaint requires that the bridge tender ensure that the bridge is clear of obstructions before opening. (Am. Compl. ¶ 39). Thus, as to defendants Hamzeh and Massaro, Counts Thirteen and Fourteen fail to assert sufficient factual allegations to survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

In summary, the fact that the death of Aura Beatriz Garcia was shocking and tragic, and in all likelihood preventable, does not mean that the actions of the City, Massaro, or Hamzeh "shocked the conscience" within the meaning of the Fourteenth Amendment. The allegations under Section 1983 as to those three defendants therefore fail to state a claim upon which relief can be granted.

## IV. Conclusion

For the foregoing reasons, the motions of defendants the City of Boston, Joanne Massaro, and Fouad Hamzeh to dismiss Counts 12, 13, and 14 are GRANTED.

**So Ordered.**

Dated: April 25, 2017

s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge